STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-20-433
CV-21-434

MARK VUKASOVICH

v.                                                    ORDER

CHRISTIAN VUKASOVICH

On April 5 and 6 2023, the court presided over a two day bench trial. The court makes the following findings of fact and conclusions of law.

1. Plaintiff Mark Vukasovich ("Marko") and Defendant Christian Vukasovich ("Chris") were the sons of Sally Vukasovich.

2. Tamara Vukasovich ("Tamara") is married to Chris. She has Serbian and Canadian citizenship. She did not have residency in the United States and was required to leave the country for six months and a day each year.

3. After her husband died in 2009, Sally lived alone in the family residence in Ann Arbor Michigan.

4. Sally had a vibrant social life and was actively involved with her friends and musical groups.

5. As of 2016, Marko lived in Sutton Bay, Michigan, about a four hour drive north of Ann Arbor with his wife and children.

6. Chris and Tamara (when she was not in Canada or Europe) lived in Oregon with their children.

7. Both Marko and Chris stayed in touch with their mother, although Chris and Tamara had a warmer relationship with Sally than Marko.

REC'D CUMB CLERKS OFC
MAY 5 '23 AM10:05

8. In December 2017, Chris and Tamara discussed with Sally an arrangement where they would buy a house together and Sally would live with Chris and Tamara.

9. Until 2017, Marko had been named on Sally's checking account, had watched over her assets, and gave her financial advice. In 2015, when Sally expressed concern about her ability to remain in the house, Marko had prepared budgets that he felt showed she could maintain residence in the house.

10. In 2017, Sally went to an attorney named Charles Hoffman to prepare a will. Marko and Chris were treated equally in the will and both were named power of attorney.

11. At some point, Sally asked Marko to take his name off her accounts because she wanted to put Chris on it.

12. There is no evidence Marko mismanaged the money or was likely to do so in the future.

13. Marko felt Tamara was turning Sally against him. Based on testimony from Sally's friends and brother, the court finds sufficient evidence to infer that Chris and/or Tamara spoke of ill of Marko when speaking with Sally and told Sally he may mishandle his finances. They testified she was concerned that Marko would take her money. While Sally told her brother that Marko was "unlovable," that was during the period when Sally's feelings about Marko soured, at least in part, as a result of the influence of Chris and/or Tamara. The court cannot tell, however, to what degree the comments influenced Sally's financial decisions. The court also has no ability to determine Sally's independent feelings towards Marko.

14. At some point, Marko separated from his wife and moved to Dallas where he lived in an apartment in a high rise apartment building.

15. Over the course of 2017 and until January 2018, Chris had financial trouble. On several occasions, Sally gave him money to help pay for a lawyer for employment related

litigation, his son's tuition and other reasons. The amount totalled between $35.000 and $50,000. Sally was worried about the amount of money she had given him and it may have impacted her financial situation.

16. Sally wanted to live out her last years in a home with family. Aside from any negative influence, Sally would have preferred to live with Tamara and Chris in Maine than with Marko in Dallas, particularly given Marko's separation from his wife and change is residence. She would have preferred the Maine residence and the more family atmosphere. There was no evidence Marko was interested in having her live with him.

17. Between Marko's work, Chris's work and Tamara's nursing experience, Chris and Tamara were better positioned to care for Sally in her decline.

18. Sally assisted Chris financially even before they agreed she would live with them. She clearly would have felt compelled to assist them financially as she lived with him.

19. After the December 2017 agreement, Chris committed to a job offer at the University of Southern Maine.

20. Tamara and Sally came to Maine to look at houses for sale.

21. Tamara took her to see Attorney Karen Mendelson in Michigan in Spring, 2018. Tamara was present in the beginning, but the attorney met alone with Sally. Sally mentioned that "she was afraid Marko was going to tell her what to do." Sally also told her she was afraid Marko was going to take her money.

22. Sally wanted to pool their money to purchase the Maine property. Mendelson believed that Sally was competent to make these decisions and was thinking independently.

3

23. Any risk to Sally if she provided her money without her name on the property would have occurred if the arrangement had not worked out during her lifetime. As it happened, her goals and needs were met.

24. The attorney proposed a "Lady Bird deed" that would convey the property to Chris and Tamara at the death of Sally. Until her death, Sally could still convey the property and terminate the deed. She recommended they talk to a Maine attorney.

25. The attorney prepared a will that treated Marko and Chris equally. She did not create any documents governing Sally's money while she lived.

26. Sally was clear she wanted to live with Chris and Tamara.

27. At this time, Sally's assets included her bank account and equity in the Ann Arbor house totalling $355,000. She had monthly income from social security and her late husband's small pension.

28. After visiting the attorney and describing her plan to use the equity in her Michigan house to buy a house in Maine, Sally expressed relief and happiness to her friends.

29. None of the details were shared with Marko. There also was no evidence that Marko ever inquired as to the arrangement.

30. Tamara and Chris bought a $605,000 house in North Yarmouth. It was far more than Tamara and Chris would ever have been able to afford. It did include a nice basement apartment for Sally. All of the equity in her house went into the Yarmouth house.

31. At closing, Sally suggested that it was not necessary that she be on the deed. She attended the closing. The property was conveyed only to Chris and Tamara.

32. The property required about $90,000 in extra work. While the work was being done, Sally spent a couple of weeks with Marko in Dallas before flying on to San Diego.

33. Although she may have begun to suffer some memory loss, Sally's mind was good. She suffered from some of the ailments common to advancing years, but was in otherwise in good enough health to travel independently until July 2019.

34. The court is persuaded that until July, 2019, Sally was thinking independently and making her own financial decisions.

35. In July, 2019, while visiting a friend in Ann Arbor, she fell and broke her pelvis.

36. After a stay at rehabilitation facilities in Michigan, she returned to Maine. Her health and mind were noticeably weaker.

37. Her health continued to decline until she became bedridden. Sally died in Maine in June 2020. Chris and Tamara provided full time care and there is no claim that they did not provide her with good care.

38. After she died, Chris told Marko she no longer had any assets that would pass according to the will.

## DISCUSSION

There are two lawsuits consolidated here. The first case is a lawsuit by Marko against Chris and Tamera alleging that they interfered with Marko's expectancy of an inheritance from Sally. The second case is a lawsuit by Marko as the personal representative of Sally's estate seeking recovery under the Improvident Transfers of Title Act. The court addresses them each in turn.

1. Intentional Interference with an Expectancy

To recover for intentional interference with an expectancy, Marko must prove four elements by a preponderance of the evidence. He must prove: (1) the existence of an expectancy of inheritance; (2) an intentional interference by a defendant through tortious conduct, such as

5

fraud, duress, or undue influence; (3) a reasonable certainty that the expectancy of inheritance would have been realized but for the defendant's interference; and (4) damage resulting from that interference. *Cote v. Cote*, 2016 ME 94, ¶ 12, 143 A.3d 117.

> Undue influence is defined as unfair persuasion of a party who is under the domination of the person exercising the persuasion or who by virtue of the relation[ship] between them is justified in assuming that that person will not act in a manner inconsistent with his welfare. A presumption of undue influence arises if the plaintiff shows by a preponderance of the evidence that a confidential relationship existed between the defendant and the decedent. A confidential relationship is one in which an individual placed trust and confidence in the defendant and there was a great disparity of position and influence in the relationship.

*Id.* (quotations and citations omitted).

Here, the key decision that would substantially interfere with Marko's expectancy under Sally's will would be when she decided in the Spring of 2018 to convey the $355,000 in equity in her Michigan home to Tamera and Chris to purchase the house in Maine. The court is not persuaded that at the time she made that decision, transferred the funds, and agreed that the property would be titled in their name, Sally was "under the domination of" Chris or Tamara. Similarly, the court is not convinced that at that point, the "there was a great disparity of position and influence in the relationship." That was certainly true after July 2019. In the Spring of 2018, however, Sally appears to be acting as her own free will. Her decision to want to live with family, her choice of Chris and Tamara, and her decision to financially support him given his circumstances and her decision to live with them all make logical sense and were reached independently. She had some medical issues, but she was still acting independently. It is more likely than not she reached those decisions independently regardless of her feelings for Marko and to the extent those feelings were influenced by Chris and Tamara. A parent's decision to financially support the son or daughter who is financially weaker is not uncommon. Reasonable people can disagree whether that is appropriate, but the court concludes Sally independently

6

reached those decisions on her own. She was also able to meet her goal of living with her family until her passing.[1]

### 2. Improvident Transfer.

Here, Marko brings a claim on behalf of Sally's estate seeking to void her transaction to Chris and Tamara, primarily the conveyance of her equity in the house to Chris and Tamara.

> In any transfer of real estate or major transfer of personal property or money for less than full consideration or execution of a guaranty by an elderly person *who is dependent on others* to a person with whom the elderly dependent person has a confidential or fiduciary relationship, it is presumed that the transfer or execution was the result of undue influence, unless the elderly dependent person was represented in the transfer or execution by independent counsel.

33 M.R.S. § 1022(1)(emphasis supplied). "Independent counsel" is "an attorney retained by the elderly dependent person to represent only that person's interests in the transfer." 33 M.R.S. § 1021(3). The Law Court has not identified with specificity factors for determining whether an attorney was acting as "independent counsel." *Young v. Lagasse*, 2016 ME 96, ¶ 10, 143 A.3d 131. In *Young*, it was sufficient that counsel met twice with the elderly person "before completing the transfer, including once for over an hour; that [counsel] advised her of the consequences and the finality of her decision; and that [counsel] believed she was aware of what she was doing." *Id.*

Here, for the reasons already described, the court does not find that Sally was dependent at the time she transferred the sale proceeds from the house. Furthermore, the court finds that the meeting with Attorney Mendelson was sufficient for the court to conclude she had met with independent counsel.

---

[1] The court is also not persuaded Marko proved the amount he would have received under the will if these events had not occurred. The court agrees that as it turned out, Chris financially benefitted from these transactions. The amount Marko would have benefitted from the Estate had these transactions not gone forward, however, is unclear. The court has no understanding of the cost of Sally's other options after she sold the Ann Arbor house, particularly after her fall in July 2019.

The court recognizes Marko's legitimate concerns. Chris and Tamera disproportionately benefitted financially from these transactions. Chris has not demonstrated financial independence, relying on his mother from the time she donated his deposit on the Oregon house until her death. Marko was cut out of his mother's decision making process and Chris benefitted. On the other hand, Chris and Tamara provided the home and care she wanted. The court also concludes that Marko did not meet the burden to prove that Sally did not make these decisions independently and in her own interest.

The entry is: Judgments for the Defendants on all Counts in Dockets CV 20 433 and CV 21 434.

This Order is incorporated on the docket by reference pursuant to M.R.Civ.P. 79(a).

DATE: 5/5/23

Thomas R. McKeon
Justice, Maine Superior Court

8